IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE CO., | ) | |
|     Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 08-00623-KD-N |
| | ) | |
| THE MITCHELL COMPANY, INC., | ) | |
| and JOSEPH J. CAMPUS, III, | ) | |
|     Defendants. | ) | |

## ORDER

This matter is before the Court on TMC's Motion for Summary Judgment (Docs. 141-143), Hartford's Response (Docs. 157-160) and TMC's Reply (Doc. 170); and Hartford's Motion for Summary Judgment (Docs. 144-149), TMC's Response (Docs. 155, 156) and Hartford's Replies (Docs. 171-175).[1]

### I.     Procedural Background

Hartford Fire Insurance Company ("Hartford") initiated this action by filing a Complaint for Declaratory Judgment against The Mitchell Company, Inc. ("TMC") and Joseph J. Campus, III ("Campus") stemming from an insurance policy that Hartford issued to TMC. TMC asserts that the policy covers losses which resulted from Campus' alleged employee "theft." Hartford disputes TMC's coverage claim, and asserts as follows:

> . . . . Hartford issued a Crime SHIELD Policy to TMC which provides coverage for specific losses resulting from employee theft, as defined by the Policy. TMC has asserted a claim for alleged losses arising from actions of TMC's former employee, Campus. Based upon Hartford's investigation, Hartford does not believe the alleged losses are covered by the Policy because of the following three independently sufficient reasons: (1) the alleged losses do not constitute "theft" as

---

[1] TMC has moved only for partial summary judgment as to the declaratory judgment claim. Additionally, Hartford requested oral argument (Doc. 149), a request which this Court **DENIES.**

1

that term is defined in the Policy; (2) the alleged losses are excluded by other
terms of the Policy; and (3) TMC failed to provide Hartford with proper notice of
the alleged losses as required for coverage under the Policy....

(Doc. 1 at 2). Additionally, Hartford asserts a claim against Campus, that "[t]o the extent that the Court determines that Hartford has any liability to [Mitchell] under the . . . Policy, Campus is liable to Hartford in an equal amount and Hartford is entitled to a matching judgment against Campus for any amounts that Hartford may be adjudged liable to [Mitchell]." (Id. at 16).

In response, TMC filed a counterclaim against Hartford for breach of contract and bad faith, alleging that Campus' failure to disclose his involvement in, and profit from, the sale of real property to TMC, constitutes "theft" under the Policy entitling TMC to payment. (Doc. 10). TMC contends that Campus "stole in excess of $5 million from TMC. Said loss is covered under the policy." (Id. at 8 at ¶5).

## II. Factual Background[2]

### A. The Parties

Hartford is a corporation organized and existing pursuant to the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut. (Doc. 1 at ¶1). TMC is an Alabama corporation with its principal place of business in Mobile, Alabama. (Id. at ¶2). Campus is an individual resident of the State of Florida. (Id. at ¶3). According to a previously filed Corporate Disclosure Statement, TMC is 100% owned by JDC Acquisition Corporation.

---

[2] When ruling on a motion for summary judgment, the Court views "the evidence and all reasonable inferences in the light most favorable to the non moving party." Battle v. Board of Regents for Ga., 468 F.3d 755, 759 (11th Cir. 2006). The standard of review for cross-motions, which is the case here, does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether any of the parties deserve judgment as a matter of law on the facts that are not disputed. American Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005); Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001).

(*The Mitchell Co., Inc. et al v. Joseph J. Campus, III*, CV 08-342-KD-C (Doc. 5)). See also Doc. 145 at 1. JDC is owned by John Saint, Donald Kelly and Chester Stefan. (Doc. 145 at 1).

B.  **Relevant Portions of the CrimeSHIELD Policy**

On February 1, 2006, JDC Acquisition Corporation ("JDC")[3] obtained a "CrimeSHIELD Policy for Mercantile Entities" with Hartford. **Section I** of the Policy states that Hartford will pay for a covered loss "[i]n exchange for the payment of premium and subject to the . . . Insuring Agreements . . . General Conditions, Definitions and terms of this Policy." (Doc. 143-11 at 3). **Section II** "Insuring Agreements," Sub-Section A. **"Insuring Agreement 1.-Employee Theft,"** provides that "[w]e will pay for loss of or damage to 'money' . . . which results directly from 'theft' by an 'employee', whether or not identifiable, while acting alone or in collusion with other persons." (Id.) **Section VII** "Definitions," Sub-Section R, defines theft as follows: "'Theft' means the unlawful taking of 'money', 'securities' or 'other property' to the deprivation of the insured." (Id. at 16). **Section V** of the Policy provides the following exclusions:

> **V. EXCLUSIONS [ ]**
> **This Policy Does Not Apply To And We Will Not Pay For:**
> * * *
> **C. Acts of Employees, Managers, Directors, Trustees or Representatives**
> Loss resulting from "theft" or any other dishonest or criminal act committed by any of your "employees", managers, directors … or representatives whether acting alone or in collusion with other persons or while performing services for you or otherwise except when covered under Insuring Agreement 1.
> * * *

---

[3] According to Endorsement 001C, the Policy applies to "any interest now or hereafter 50% or more owned, controlled or operated by any one or more of those named as Insured, subject to provisions 1. and 2. of GENERAL CONDITION G. CONSOLIDATION OR MERGER." (Doc. 143-11 at 22). As such, while the parties have not alleged as such, the Court presumes based on the parties' representations in this case, that the Policy covers and applies to TMC because while TMC is not a named insured under the Policy, per Endorsement 001C, TMC is covered by the Policy given that JDC owned 50% or more of TMC as of February 1, 2006.

3

    **E. Exchanges or Purchases**
    Loss resulting from the giving or surrendering of property in exchange or purchase.
* * *
    **H. Indirect Loss**
    Loss that is an indirect result of any act or "occurrence" covered by this policy including but not limited to loss resulting from

        1. your inability to realize income that you would have realized had there been no loss of or damage to "money[]" ….
* * *
    **R. Voluntary Parting of Title To or Possession of Property**
    Loss resulting from your, or anyone acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

(Doc. 143-11 at 5-7).

**C.**     **The Claim**

On March 9, 2007, TMC notified Hartford of a claim under the Policy resulting from Campus' alleged theft as a former employee. (Doc. 1 at 3 at ¶7). At that time, TMC claimed losses totaling $5,418.767. (Id. at 9 at ¶50).

On March 26, 2008, TMC submitted a Proof of Loss describing its loss to Hartford as follows: that it "suffered loss through theft by" Campus "and that the amount of money …misappropriated by theft, amounts to" $5,418,767.00, as a "true net loss" from April 2005-February 2007. (Doc. 143-6 at 22-24 ("Proof of Loss")). TMC described the loss as follows: "legal entities affiliated with [Campus] purchased the land and then quickly re-sold the land to the insured ("flipping") at a much higher price. Had the principal [Campus] acted in good faith as an employee and officer of [TMC], the land would have been purchased directly by the insured for the lower price. The overpayments by the insured [TMC] on the six transactions listed on Schedule 2 total $3,923,000." (Doc. 148-3 at 2). TMC subsequently submitted an Amended Proof of Loss in which it asserted a total loss for the properties at issue of $4,735,567.

4

(Doc. 143-6 at 25).

**D.  Underlying Misconduct**

The parties state that they do not dispute the underlying facts tied to Campus' alleged misconduct.  Joseph J. Campus, III ("Campus") was an officer and a board member of TMC, Executive Vice-President and Head of the Single-Family Division at TMC.  He was employed by TMC from 1990 through March 7, 2007.  As part of his job Campus would, along with TMC City Managers, find property, perform due diligence on the property and make recommendations to the TMC board regarding the purchase of the property for development.  After viewing the property, the TMC board would make the final determination whether to the purchase the property.  Each board member had considerable real estate experience.

Campus was also a member of, or affiliated through James Young with, several LLCs whose business purpose included buying and flipping property for a profit.  During 2005-2006, Campus received payments from Young or one of the LLCs when TMC purchased certain properties from Young or one of the LLCs.  Specifically, the seven properties at issue are:

1) Bagdad 80 – This property was owned by Young and Campus.  It was sold to TMC for approximately $2 million more than Young and Campus paid to purchase it.  Campus was paid approximately $1 million.

2) Dogwood Capri – Campus found this property and told Young about the property.  Young puchased the property. TMC then bought this property from Young.  Young paid Campus $105,000.

3) Dogwood Magnolia – Young owned this property and sold it to TMC.  Young paid Campus $152,000.

5

4) Medicine Bow/Holly Cliff – Young owned this property and sold it to TMC. Young paid Campus $266,000.

5) Pond Creek - Young and Campus owned this property. TMC agreed to buy the property for approximately $1 million more than Young's and Campus' purchase price, however the property did not close.

6) Stapleton 70 – Campus assisted Young in buying this property for $1.2 million. One month later, Young sold the property to TMC for $2.1 million.

7) Loxley 16 – Campus and Young owned this property and sold it to TMC. Campus was paid $106,000.

TMC was not aware of Campus' financial interest in the sale of the properties. TMC contends that had Campus acted in good faith as an employee of TMC, TMC could have acquired these properties at a substantial savings.

## III. Summary Judgment Standard

Summary judgment should be granted only if "there is no genuine issue as to any material fact and [ ] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[4] The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment always bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

---

[4] Rule 56(c) of the Federal Rules of Civil Procedure, provides that summary judgment shall be granted: "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

6

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992), cert. den., 507 U.S. 911 (1993) (internal citations and quotations omitted). The mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. Lofton v. Sec'y of the Dep't of Children & Family Serv., 358 F.3d 804, 809 (11th Cir. 2004), cert. den., 534 U.S. 1081 (2005).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether any of the parties deserve judgment as a matter of law on the facts that are not disputed. American Bankers Ins. Group v. United States, 408 F.3d 1328, 1331 (11th Cir. 2005); See also e.g., Gerling Global Reinsurance Corp. of Am. v. Gallagher, 267 F.3d 1228, 1233 (11th Cir. 2001). Courts consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. Id. See also e.g., United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984).

## IV. Discussion

TMC and Hartford's cross-motions for summary judgment center on three (3) issues: 1) whether coverage exists (*i.e.*, whether Campus' actions constitute theft under the Policy) and/or whether certain exclusions apply; 2) whether TMC gave proper notice to Hartford under the Policy; and 3) whether Hartford breached the Policy and/or engaged in normal and abnormal bad faith. However, despite the approximately *4160* pages of substantive briefing and voluminous exhibits submitted by the parties, this case is decided by the first issue: whether Campus' alleged misconduct constitutes "theft" as defined in the Policy such that it is a covered claim.

In its counterclaim, TMC asserts that Campus stole in excess of $5 million from TMC. TMC argues that Campus committed theft as defined under the policy because: 1) his actions were unlawful as they involved deception and breaches of his corporate duties, constituting civil violations of Alabama's Civil Corporate Code, Ala. Code §§ 10-2B-8.30, 10-2B-8.42 and 10-2B-8.60--8.64); 2) his actions constitute criminal violations of Alabama's Criminal Code as acts of "theft by deception" under §§ 13A-8-1 and 13A-8-2 Ala. Code; 3) a "taking" can be accomplished through a kickback (*i.e.*, the money that he received); and 4) his "unlawful taking" was a "deprivation to" TMC because TMC paid out millions of dollars for properties that it would never have purchased if TMC had known that Campus was going to gain personally.

In the alternative, TMC contends that Hartford's definition of theft in the Policy is ambiguous: "[i]f the Court accepts Hartford's interpretation of its policy definition of theft as excluding theft by fraud and losses resulting from voluntarily parting with money due to a dishonest act as a reasonable interpretation, then the policy definition of theft should be held to be ambiguous." (Doc. 142).

In contrast, Hartford contends that Campus' alleged misconduct, while improper, falls outside its enumerated coverage obligations because his conduct does not constitute "theft" as defined in the Policy. Rather, Hartford argues, Campus' acts were non-covered occurrences of self-dealing or breach of fiduciary duties. According to Hartford, the only thing that TMC can claim was taken by Campus was TMC's business "opportunity" to purchase the properties at a lower price.

A contract of insurance is essentially like all other contracts, and governed by general rules of contract such that absent ambiguity, insurance policies are to be enforced according to their express terms and those terms should be given their plain and ordinary meaning. See, e.g., Farmers & Merch. Bank v. Home Ins. Co., 514 So.2d 825 (Ala. 1987); Upton v. Miss. Valley Title Ins. Co., 469 So.2d 548, 553-554 (Ala. 1985). See also Caribbean I Owners' Ass'n, Inc. v. Great. Am. Ins. Co. of N.Y., 600 F. Supp. 2d 1228, 1244-1245 (S.D.Ala. 2009), Indeed, "[w]here an insurance policy defines certain words or phrases a court must defer to the definition provided by the policy." St. Paul Fire & Marine Ins. Co. v. Christiansen Marine, Inc., 893 So.2d 1124, 1136 (Ala. 2004). This rule of construction is "especially applicable" where the contract is between "sophisticated parties." Farmers, 514 So.2d at 831. The rule that insurance contracts must be enforced as written is equally applicable to exclusions in the contract. See, e.g., Allstate Ins. Co. v. Hardnett, 2000 WL 283884, *2 (Ala. Mar. 17, 2000). "Courts are not at liberty to rewrite policies to provide coverage not intended by the parties" and "cannot defeat express provisions in a policy, including exclusions from coverage, by making a new contract for the parties." Altiere v. Blue Cross & Blue Shield of Ala., 551 So. 2d 290, 292 (Ala. 1989).

TMC, as the insured, bears the burden of establishing coverage under the Policy – thus, TMC bears the burden of establishing that Campus' alleged misconduct constitutes theft as defined in the Policy. See, e.g., Jordan v. National Acc. Ins. Underwriters Inc., 922 F.2d 732, 735 (11th Cir. 1991); Caribbean I Owners' Ass'n., 600 F. Supp. 2d at 1244. Hartford, as the insurer, bears the burden of proof of establishing the applicability of any exclusions. See, e.g., Hermitage Ins. Co. v. Champion, Slip Copy, 2010 WL 1711049, *3 (M.D. Ala. Apr. 27, 2010) (citing U.S. Fidelity & Guar. Co. v. Armstrong, 479 So.2d 1164, 1168 (Ala. 1985)).

Insuring Agreement 1 states that the Policy provides coverage for "loss of … money… which results directly from theft by an employee, whether or not identifiable, while acting alone or in collusion with other persons." (Doc. 143-11 at 3). Theft is then defined in the Policy as "the unlawful taking of money[5]… to the deprivation of the insured." (Id. at 16). It is clear that Campus received money, either in the form of "commissions" or profit, from transactions in which TMC purchased properties. Campus did not disclose to TMC his financial interest in the properties. However, this behavior cannot not be characterized as theft as defined in the policy.

TMC's argument is essentially that any unlawful act (whether civil or criminal) by an employee which results in loss to the employer is theft. However, the plain language of the policy states that TMC's loss must directly result from an employee's theft, *i.e*.,"unlawful taking," of money. Campus did not take money from TMC. Campus received money from the seller of the property or he made a profit by undisclosed self-dealing, *i.e*., usurping TMC's opportunity to buy the property at the lower price. TMC states that they would not have purchased the property if they had known of Campus' involvement and then speculates that they

---

[5] The parties agree that "money," not securities or other property, is at issue.

could have bought the property at a lower price had Campus not had a financial interest in the deal. Assuming this is true, what TMC was deprived of by Campus' acts was the opportunity to buy the properties at a lower price. See, e.g., Benchemark Printing, Inc. v. American Mfrs. Mut. Ins. Co., 2001 WL 66310, *3 (N.D.N.Y. Jan. 26, 2001) (finding that there had been no loss of covered property because "[w]hat Benchemark really lost were business opportunities whereby [the employee] essentially put himself in the place of his employer[]"). While Campus' acts were certainly dishonest, they do not constitute theft of money by Campus.

TMC also argues that Campus' acts constitute theft by deception.[6] Assuming that an "unlawful taking" encompasses "theft by deception," Campus' acts do not constitute employee theft by deception. While Campus had a fiduciary obligation to disclose his financial interest in the transactions, his failure to do so did not deprive TMC of the benefit of their bargain. TMC, through its board members and other employees, made a considered decision to purchase the property at a certain price.[7] TMC has not presented any evidence that Campus presented any false information about the property, that he assisted Young in presenting false information about the value or condition of the property. or that the property bargained for was not received. Thus, because TMC got exactly what they paid for, there has not been a theft by deception. See, e.g., A.A. Chandler v. State, 615 So.2d 100 (Ala. Crim. App. 1992).

---

[6] "While definitions under the criminal law are some authority and can serve as a guide to interpretation, such definitions are not controlling for the purposes of construing the language found in an insurance policy." Liggans R.V. Center v. John Deere Ins. Co., 575 So.2d 567, 570 (Ala. 1991).

[7] The court notes that TMC presented testimony from Lindsey Boney, TMC's CFO, which indicates that Campus was ultimately responsible for the negotiations concerning the purchase price. However, Boney did not know, nor has any evidence been presented, regarding who actually negotiated the purchase price on most of the properties. Campus, whose testimony was submitted by TMC, indicated that City Manager Saba negotiated the sale price on some of the properties at issue.

Cases relied upon by TMC are distinguishable. In <u>Morris Kirschman & Co., L.L.C. v. Hartford Fire Ins. Co.</u>, 2004 WL 1934848 (E.D. La. Aug. 30, 2004), the scheme involved the employee's manipulation of $5 million in accounts receivables to make them appear current, *i.e.* paid. In other words, she committed theft by unlawfully taking the accounts receivables which was the property of her employer.[8] In <u>FDIC v. National Union Fire Ins. Co. of Pittsburgh, PA</u>, 205 F.3d 66, 70 (2nd Cir. 2000), the acts of the employee were determined to be "dishonest," a specifically covered act in the policy ("loss resulting directly from dishonest or fraudulent acts committed by an Employee").[9] Two cases cited by TMC, <u>Hartford Fire Ins. v. Clark</u>, 562 F.3d 943 (8th Cir. 2009) and <u>Gulf USA Corp. v. Federal Ins. Co.</u>, 259 F.3d 1049 (9th Cir. 2009) (noting that the parties did not dispute whether the alleged actions of the board member constituted a "theft" under the Crime Policy), fail to discuss the issue of what constitutes an unlawful taking.

**V.    Conclusion**

Accordingly, it is **ORDERED** that Hartford's motion for summary judgment on its declaratory judgment claim is **GRANTED** such that there is no coverage for TMC for Campus' alleged misconduct under the Policy.

As a result of this ruling, it is further **ORDERED** that Hartford's motion for summary judgment on TMC's breach of contract and bad faith counterclaims, as well as TMC's partial

---

[8] The employer was prevented from recovering the value of these accounts receivable because they did not constitute "tangible property."

[9] Dishonest acts and criminal acts (other than theft) are specifically excluded from coverage under the policy at issue.

12

motion for summary judgment on Hartford's declaratory judgment claim, are **MOOT.**[10]

**DONE** and **ORDERED** this the **15th** day of **December 2010.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

[10] Campus moved for summary judgment as to Hartford's only claim against him: "[t]o the extent that the Court determines that Hartford has any liability to [TMC] under the … Policy, Campus is liable to Hartford in an equal amount and Hartford is entitled to a matching judgment against Campus for any amounts that Hartford may be adjudged liable to [TMC]." (Doc. 1 at ¶72). In light of the foregoing, it is also **ORDERED** that Campus' motion for summary judgment (Docs. 125, 126) is **MOOT.**